IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RICHARD BROWN, JR, | ) | 4:04CV3217 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| THE GOODYEAR TIRE AND | ) | |
| RUBBER COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Richard Brown, Jr. was dismissed from employment with the defendant, The Goodyear Tire and Rubber Company ("Goodyear").  His complaint asserts claims under Title VII, 42 U.S.C. § 2000e et seq., the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. Ann. §§ 48-1101 to 48-1126 (LexisNexis 2002 & 2005 Cum. Supp.) ("NFEPA"), and the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA").  Brown alleges (1) discrimination based on color, in violation of Title VII and NFEPA; (2) retaliation for filing discrimination suits, in violation of Title VII and NFEPA; and (3) terminating his employment pursuant to the Goodyear Attendance Policy for an absence allegedly "cured" by an improperly denied  FMLA leave request, in violation of the FMLA.

This matter is before the court upon Goodyear's motion for summary judgment. (Filing 34.)  By order entered March 2, 2006, I entered summary judgment for Goodyear, with a memorandum and order setting forth the court's findings to follow. (Filing 46.)  This memorandum and order sets forth those findings.

# I. BACKGROUND

As required by NECivR 56.1(a), Goodyear's brief in support of its motion sets forth facts supported by pinpoint references to evidence that would be admissible in evidence within the meaning of NECivR 7.1(a)(2).  Thus, Brown was required to respond with a brief that includes "a concise response to the moving party's statement of material facts" and addresses "each numbered paragraph in the movant's statement."  In the event of disagreement, Brown was required to supply pinpoint references to admissible evidence creating a material dispute as to any of Goodyear's stated facts.  NECivR 56.1(b)(1).  Brown has failed to do so.  Accordingly, I find and conclude that Goodyear's statement of facts is deemed admitted.  NECivR 56.1(b) ("Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.").

The undisputed material facts are set forth below.[1]

1.      The production, maintenance, warehousing and shipping employees at Goodyear's Lincoln plant are part of a collective bargaining unit represented by the United Steelworkers of America ("Union").  (Konneker Decl. ¶ 3.)

2.      Richard Brown, the plaintiff in this lawsuit, was hired by Goodyear on May 8, 1978.  He is African-American.  For the entire period of his employment he has been an hourly-paid employee of Goodyear and part of the collective bargaining unit represented by the Union.  On April 8, 2003, Plaintiff was discharged from his employment at Goodyear for the stated reason of violation of Goodyear's attendance policy.  (Konneker Decl. ¶ 4; Pl.'s Dep. 24:8-21, 37:17-24.)

---

[1]Unless otherwise noted, the citations to the record refer to Goodyear's index of evidence (filing 36).

3.      On April 19, 1997, the Union called a strike at Goodyear in Lincoln. The strike continued until May 9, 1997.  Of the 1,370 employees at the plant in the bargaining unit represented by the Union at that time, only two crossed the picket line and worked during the strike.  One of those two was Brown and the other was Stanley Dowd.  Both Brown and Dowd are African-American.  In Union parlance, those who cross picket lines and go to work during a strike are known as "scabs."  During the strike and for a period of time afterward, Brown and Dowd were ridiculed for crossing the picket line.  Brown and Dowd filed a charge of discrimination against Goodyear with the Nebraska Equal Opportunity Commission ("NEOC") over this conduct on or about July 3, 1997.  Eventually, Brown and Dowd filed a lawsuit in the United States District Court for the District of Nebraska against Goodyear and the Union containing the allegations of the NEOC charges.  The case was titled <u>Dowd v. United Steelworkers</u>.  The docket number was 4:98CV3164.  In the fall of 1999, this dispute between Brown, Dowd and Goodyear was settled and the case against Goodyear was dismissed.  (Filing 45-2, Williams Supp'l Decl. ¶ 2.)

4.      Plaintiff filed his second NEOC charge against Goodyear on August 12, 1998.  In that charge, he claimed that a sixty-day suspension was an act of unlawful retaliation for his having filed the first charge.  Plaintiff had been suspended in July, 1998, for providing false information in a disciplinary investigation and coercing another employee to do the same.  Plaintiff filed a lawsuit over this claim in the United States District Court for the District of Nebraska:  <u>Brown v. The Goodyear Tire and Rubber Company</u>, Docket No. 4:00CV3285.   Goodyear's motion for summary judgment was granted and the court dismissed the case on October 22, 2001.  (Williams Decl. ¶ 4; Pl.'s Dep., 29:2-30:5 & Ex. 4.)

5.      Plaintiff testified that the reason that he believes his discharge was an act of retaliation for having filed the prior charges was because "any company, you know, that you file a – file charges against, you know, that they are going to look at you different, you know?  They don't – I don't think that they like that, so that's why I

feel like they had – that had something to do with it."  Plaintiff could cite no other reason for his belief.  (Pl.'s Dep. 125:4-21.)

<u>Goodyear's Attendance Policy and Plaintiff's Discharge<br>for Violation of the Policy</u>

6.    Goodyear has had an attendance policy for many years.  Effective January 1, 1998, Goodyear revised and reestablished its attendance policy, titled "Attendance Program and Administration Policy Statement" ("Attendance Policy"). The Attendance Policy provides progressive discipline in three steps.  Disciplinary letters accompany each step.  Employees who reach the third step are limited to 3.5 "occurrences" in the twenty-four month probationary period following the date when they are placed on the third step.  Employees who exceed 3.5 occurrences are subject to discharge.  What constitutes an "occurrence," and the manner in which the program is administered, is described in the Attendance Policy.  (Konneker Decl., ¶ 5 & Ex. 1; Pl.'s Dep., 106:12-107:21 & Ex.'s 11, 16.)

7.    Under the Attendance Policy, Brown received Step 1, Step 2, and Step 3 letters.  He received a Step 1 Attendance Review letter on January 7, 2000.  He received a Step 2 Attendance Review letter on August 14, 2000.  He received a Step 3 Attendance Review letter on May 30, 2001.  In accordance with the Attendance Policy, on May 30, 2001, Brown was placed on a 24-month probation during which he could incur no more than 3.5 occurrences.  Under the Attendance Policy, if Brown exceeded 3.5 occurrences during his 24-month probationary period, he was subject to discharge.  Brown did not file grievances or discrimination claims concerning the issuance of any of the attendance review letters.  At the time of the Step 3 Attendance Review process, Brown composed a handwritten letter committing himself to improve his attendance.  At each stage of the progressive discipline, there is a mandatory meeting between the employee and at least one representative of Goodyear management and, often, a Union representative.  (Konneker Decl., ¶ 6 & Ex. 1; Pl.'s Dep., 100:2-101:1, 103:24-104:25, 106:12-107:21, 108:15-110:16 & Ex.'s. 15, 16.)

8.     During Brown's probationary period, in 2002, he reached 3.5 occurrences under the Attendance Policy. On July 11, 2002, Brown was assessed with one-half an occurrence. Another occurrence was assessed in November, placing Brown at 3.5 occurrences during his probationary period. Pursuant to the Attendance Policy, if any employee reaches 3.5 occurrences during a probationary period, the employee is given notice via a letter generated by an attendance clerk. When Brown received a November 4, 2002 letter advising him that he had reached 3.5 occurrences, Brown challenged the July 11 one-half occurrence. He complained to Area Manager Wally Hughes that the one-half occurrence for July 11, 2002, shouldn't have counted because it was excused. On July 11, 2002, Brown had been excused for 2-1/2 hours of his shift. Under the Attendance Policy, excused absences during a shift for a duration of two to four hours count as one-half of an occurrence, which was the amount noted on the November 4, 2002, letter. Brown did nothing further to follow up on this issue; he made no further contact with his Area Manager or anyone else in management about it. He filed no grievance, and he filed no discrimination charge with respect to it. In his deposition, Brown testified that he thought that he might have been released early on July 11, 2002, for Goodyear's convenience, in which case no occurrence should have been recorded. Goodyear's time records establish that he did not leave early that day. He left in the middle of his shift for 2-1/2 hours then returned to work. Goodyear does not release employees for its convenience in the middle of a shift and then have them return to finish the shift. (Keith Decl. ¶ 3; Caster Decl. ¶¶ 3 & 4; Hughes Decl. ¶ 2; Pl.'s Dep., 110:17-114:20 & Ex. 17.)

9.     On January 30, 2003, Brown was scheduled for overtime. He neither reported for his scheduled overtime nor called in to a supervisor to report that he would not be there. His failure to call in or show up constituted an occurrence that made Brown subject to discharge. In his meeting with Marschman and Production Manager Dennis Shultz, Brown claimed to have tried unsuccessfully to call in and also claimed that others had failed to show up or call in for scheduled overtime. Marschman investigated Brown's claim and found that Brown was correct that Area

Managers had permitted employees not to show up for scheduled overtime or call in without counting it as an occurrence under the Attendance Policy.  On that basis, Marschman wrote to Brown that his violation of the Attendance Policy would not be counted as an occurrence and therefore Brown would not be discharged for it. Marschman also advised Brown that the practice of failing to "report off" of overtime would end for Brown and for everyone else also.  Marschman confirmed this in a letter to Brown dated February 10, 2003.  Brown testified that the contents of the letter were accurate.  (Marschman Decl., ¶ 5 & Ex. 3; Plaintiff's Dep., 114:21-122:7 & Ex. 18.)

10.    On Friday, April 4, 2003, Brown was scheduled to arrive at work at 11:00 p.m. for an eight-hour shift ending on April 5, 2003.  By 11:30 p.m., Brown had not shown up for work.  The department where Brown worked was short-handed so Goodyear Area Manager Sue Smith called Brown at home.  Brown was asleep and the ringing of his telephone awakened him.  Brown knew that an additional occurrence (whole or fractional) would subject him to discharge under the Attendant Policy.  He asked Smith not to report it.  Smith refused, asked Brown to come to work, and told him that his delayed arrival would count as one-half an occurrence. Brown arrived at work about 11:45 p.m. on April 4, approximately 45 minutes late. (Pl.'s Dep. 73:6-78:1.)

11.    The one-half occurrence on April 4 put Brown over the limit of occurrences permitted while on probation under the Attendance Policy.  After Brown arrived at work on Sunday, April 6, 2003, for an 11 p.m. to 7 a.m. shift, Brown met with Sue Smith and Night Shift Coordinator Bob Tlamka, who suspended him. Brown was told in the meeting that he would have to talk with Division Operations Manager Gary Marschman.  (Marschman Decl. ¶ 6; Pl.'s Dep. 78:2-82:5.)

12.    Early in the afternoon of April 7, 2003, Brown came to the Goodyear plant.  Brown met with Gary Marschman and Mike Keith, a Goodyear Human

Resources Administrator.  (Marschman Decl. ¶ 7; Keith Decl. ¶ 4; Pl.'s Dep. 84:13-85:16.)

13.    Just prior to the meeting Brown gave Mike Keith a Certification of Health Care Provider and requested FMLA leave for April 5, 2003.  Brown had not been absent on April 5, 2003.  He was 45 minutes late arriving for his shift on April 4, 2003, which started at 11:00 p.m.  Brown arrived at 11:45 p.m. and worked the rest of the shift, which ended approximately at 7:00 a.m. on April 5.  If Brown's FMLA request had covered his lateness on April 4, and if such a request were granted, the lateness would not have been counted as an occurrence and Brown would not have been subject to discharge.  (Pl.'s Dep. 72:14-73:18; Marschman Decl. ¶ 8; Keith Decl. ¶ 5.)

14.    At the April 7, 2003 meeting with Marschman and Keith, Brown said that on April 4 he took some Tylenol for a headache and fell asleep.  He told them that he was awakened by Sue Smith's telephone call at about 11:30 p.m. or 11:45 p.m. and then came to work.  He said that his son was sleeping and his wife was not home which is the reason that he overslept.  Marschman told Brown to go home and that they would notify Brown about the consequences.  (Marschman Decl. ¶ 7.)

15.    Keith reviewed the FMLA certification form submitted by Brown and rejected it.  Keith wrote a letter to Brown on April 7 telling Brown that his request was rejected and the reasons for the rejection.  Keith also told Marschman that Brown's request had been rejected and the reasons for the rejection.  After discussing with Keith the disposition of Brown's FMLA request, Marschman sent a letter to Brown on April 8, 2003, notifying Brown that he was discharged for violating the Goodyear Attendance Policy.  (Keith Decl. ¶ 6; Marschman Decl. ¶¶ 8-9 & Ex. 4; Pl.'s Dep. 146:21-151:8, Ex. 19 & 20.)

## Brown's FMLA Efforts

16.    Brown visited his physician's office on April 7, 2003.  Brown had not been to the doctor since September 24, 2001, for any reason.  On April 7, he was seen by Brad Christiansen, a physician's assistant.  Brown had been diagnosed with hypertension (high blood pressure) at least as early as 1998.  Christiansen prescribed a refill of Brown's blood pressure medicine, which had run out sometime in mid-2001 and which Brown had not had refilled since then.  Christiansen noted that Brown reported a headache, but he did not diagnose it as a migraine.  Christiansen also arranged for a cardiolite treadmill test for Brown the following day, April 8, 2003, to check for heart disease.  The results of the test were negative.  Brown did not have heart disease.  (Pl.'s Dep, 158:2-159:13 & Ex. 21; Dr. Handke Dep. 24:1-25, 54:21-23, Christiansen, P.A. Dep. 15:23-16:18, 23:20-31:10, 41:22-42:11.)

17.    On April 7, at Brown's request, Christiansen filled out a "Certification of Health Care Provider" form for Brown.  Form WH-380, produced by the U.S. Department of Labor and provided to its employees by Goodyear, indicated six (6) possible categories qualifying as "serious health conditions" which qualify for FMLA leave:  Hospital Care, Absence Plus Treatment, Pregnancy, Chronic Conditions Requiring Treatments, Permanent/Long-term Conditions Requiring Supervision, and Multiple Treatments (Non-Chronic Conditions).  Christiansen checked category two, meaning that Brown had a serious health condition incapacitating him for more than three days that would require ongoing treatment.  Christiansen described the "medical facts" as "hypertension, with headaches."   Christiansen wrote that Brown was incapacitated for only one day, April 5, 2003.  Christiansen's report of incapacitation was based solely on Brown's report to him.  Christiansen evidenced no awareness that Brown had actually worked as scheduled on April 5, 2003.  Christiansen also wrote that Brown should return for a follow-up visit in one to two weeks.  Brown did not do so.  Christiansen wrote that Brown would be required to be absent from work for treatment in order to undergo the cardiolite stress test that was given on April 8,

2003, and that Brown was fully able to work.  (Pl.'s Dep., 136:21-138:13 & Ex. 19; Christiansen, P.A. Dep, 27:23-31:19, 36:3-41:3, 41:9-44:12 & Ex.'s 1 (pp. M28-30) and 2; Keith Decl., ¶¶ 1-2 & Ex. 2.)

18.    Brown turned in the FMLA leave request form to Goodyear where it was reviewed by Mike Keith, the Human Resources Administrator for the Belt Supply Center.  Keith sent a letter to Brown on April 7 via registered mail stating that Brown's request for leave under the Family and Medical Leave Act was rejected. Brown's wife signed for the letter on April 10, 2003. (Keith Decl., ¶¶ 5-7 & Ex. 3; Pl.'s Dep., 136:6-21, 146:21-151:8 & Ex.'s 19-20.)

19.    The April 7 letter from Keith noted that Brown had requested FMLA leave "due to . . . .a serious health condition that makes you unable to perform the essential functions of your job."  (Keith Decl. Ex. 3.) It stated:

> Mr. Brown, your request to cover the absence from 4-5-03 through 4-5-03 has been denied for the following reason(s)  1) Your Health Care Provider did not indicate for whom he was filling out the Certification of Health Care Provider from.  (question #1).  2) only migraine headaches would qualify under FMLA regulation 825.114 as a serious health condition.  3) Your Health Care Provider has submitted this request as absence plus treatment in question #3 of the certification. You were not absent more than three consecutive calendar days as required to be considered as absence plus treatment.  See me in the Belt center if you have any questions.  M. Keith"

(Id.)

20.    After receiving the April 7 letter from Mike Keith, Brown testified that he undertook efforts to obtain a new FMLA medical certification from Christiansen. No such form was ever received by Keith and Brown has not produced it.  In Brown's medical chart at Christiansen's office there is a second FMLA medical certification

that was prepared by Christiansen and signed on April 10, 2003.  Christiansen has no recollection about the reason for its preparation.  In that second form, Christiansen certified that Brown's period of incapacity commenced on April 7 and that he could return to work on April 8.  The second form contained no statement that Brown was incapacitated either on April 4 or 5.  The second form was never received by Goodyear.  (Keith Decl. ¶ 7; Pl.'s Dep., 151:11-155:16, 156:15-158:1 & Ex.'s 1 (pp. M99-101) and 19; Christiansen, P.A. Dep. 44:13-49:7, Ex.'s 1 (pp. M99-101) & 2.)

21.    Prior to requesting a leave on April 7, Brown had requested and been granted at least three leaves of absence under the FMLA.  On October 3, 2000, he was approved for a five-day FMLA leave for his own serious health condition.  On December 15, 2000, he was approved for an eight-day FMLA leave in order to provide care for his mother, who was suffering from a serious health condition.  On October 9, 2001, he was approved for a ten-day FMLA leave due to his own serious health condition.  Mike Keith approved all of these FMLA leave requests from Brown.  (Keith Decl. ¶ 8; Plaintiff's Dep., 160:12-166:20 & Ex.'s 22-27.)

22.    Goodyear receives and approves scores of FMLA leave requests each year.  In the Belt Department, where Brown worked, Mike Keith evaluated FMLA requests from 2001 until June, 2004, when the responsibility was transferred to another department.  From May 1, 2002 through April 30, 2003, Mike Keith processed 110 FMLA requests from employees in the Goodyear belt center in Lincoln.  He approved 89 of those requests, of which 83 were submitted by Caucasian employees and 6 were submitted by African-American employees.  Of the 21 denied requests, 18 were from Caucasian employees and 3 were from African-American employees.   Employees may resubmit denied requests with new or corrected information for reconsideration.   Of the 21 requests that were denied, 3 were corrected and resubmitted.  All three of the corrected and resubmitted requests were approved.  (Keith Decl. ¶¶ 2 & 9.)

<u>Brown's Hostile Work Environment Claim</u>

23.     Brown's forklift leaked fluid.  According to Brown, sometime late in 2002 or early in 2003, Doug Palmer, a coworker, made fun of Brown while Brown was mopping up fluid that had leaked from Brown's forklift.  Brown reported this incident to his supervisor, Sue Smith, who immediately spoke to Palmer about it.  After that single incident, neither Palmer nor anyone else ever again made fun of Brown mopping the floor.  (Pl.'s Dep. 38:20-42:14.)

24.     After Brown's discharge, a former Goodyear coworker called Brown and told him that a flier had been posted at Goodyear showing pictures of Brown sleeping.  The flier had been posted on a bulletin board in a production area.  In March, 2003, prior to Brown having been aware of the existence of the flier, Area Manager Wally Hughes, who was in charge of the area where the bulletin board was located, removed the fliers.  He also met with the employees of his department and advised them that the flier was inappropriate, that such materials should not be posted in the plant and that cameras were not allowed in the plant.  To the best of Hughes' knowledge, the flier never reappeared.   All of this occurred prior to Brown's knowledge of the existence of the flier and without any complaint from him.  (Plaintiff's Dep. 42:15-44:6; Hughes Decl. ¶ 3; Konneker Decl., ¶ 8 & Ex. 4.)

25.     Early in 2002 Tee Brown, another coworker of Brown, told Brown, "You know, they're going to fire you."  Brown does not know what prompted Tee Brown to say this.  The conversation lasted perhaps one minute.  Tee Brown made the remark as he was walking by a supervisor's desk at which Brown was seated.  Brown has no recollection of reporting this comment to anyone in management.  Tee Brown is African-American.  (Pl.'s Dep. 53:10-57:19.)

26.     Brown was called a "scab" (referring to his status as someone who crossed a Union picket line in 1997), but no one calling him a scab employed an

ethnic slur.  Another coworker reported Brown sleeping on the job in 2002.  Brown once found the words "nigger scabs" written on a bathroom wall late in 2002 or early in 2003.  Brown informed Area Manager Sue Smith who immediately had janitors paint over the words.  Brown requested no further action.  (Pl.'s Dep. 177:4-185:1; Williams Decl. ¶ 3.)

27.     In his NEOC Charge of Discrimination pursuant to which this suit was brought, Brown claimed that he was disciplined for putting too much grease on a mold.  In his deposition, Brown testified that he was never told that he put too much grease on a mold, nor was he ever disciplined for it.  Gary Haas was Brown's Area Manager until Haas retired.  Brown testified that he was told by Haas that two or three weeks prior to this conversation another employee had told Haas, "You need to tell that nigger not to be putting all that grease on the molds."  Brown did not hear this remark nor was it directed to him.  Brown learned of it only when Haas told him.  Haas retired from Goodyear on April 1, 1998.  (Caster Decl. ¶ 5; Pl.'s Dep., 59:12-68:9, & Ex. 5.)

28.     Brown received training in Goodyear's policy of non-discrimination and received a copy of the policy.  Brown was aware that Goodyear maintains a toll-free number to call in the event that an employee feels that he or she has been subjected to harassment.  Brown never called the number.  (Pl.'s Dep. 172:11-174:18.)

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Such a showing shifts to the non-moving party the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Further, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-moving party—here, the plaintiff—"must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  Anderson, 477 U.S. at 242, 252 & 256-57.

## B.  Discrimination Based on Race[2]

To establish a prima facie case of Title VII discrimination based on a racially hostile work environment, an employee is required to show:  (1) he belongs to a racially protected group, (2) he was subjected to unwelcome harassment, (3) the harassment was based on race, (4) the harassment affected a term, condition, or

---

[2]Brown's brief alludes to an argument about discharge based on race.  I have not considered this argument, as he did not plead a disparate treatment claim in his complaint or plead facts or offer evidence to support this claim.

privilege of his employment, and (5) the employer knew or should have known of the harassment and failed to take proper remedial action.  See, e.g., Tatum v. City of Berkeley, 408 F.3d 543, 550 (8th Cir. 2005).[3]

Regarding the fourth element, an employer's conduct "must be extreme to amount to a change in the terms and conditions of employment" and the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become 'a general civility code.'"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  All relevant circumstances are considered when assessing whether the work environment is hostile.  These include the frequency and severity of the conduct, whether it was physically threatening or humiliating or merely offensive, and whether it "'unreasonably interferes with an employee's work performance.'"  See, e.g., Al-Zubaidy v. TEK Indus., Inc., 406 F.3d 1030, 1038 (8th Cir. 2005) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher, 524 U.S. at 778 (quoting Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 82 (1998)).  The work environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim.  See, e.g., Sallis v. University of Minn., 408 F.3d 470, 476 (8th Cir. 2005).

The five incidents Brown relies on are woefully insufficient to establish a prima facie case.  I briefly highlight the insufficiencies of each of these incidents.

_____

[3]While Brown's complaint alleges violations of both Title VII and NFEPA, Nebraska courts look to federal decisions when construing the Nebraska act.  See Malone v. Eaton Corp., 187 F.3d 960, 962 n.3 (8th Cir. 1999).  Thus I do not separately address NFEPA, whether in addressing the discrimination claim or the retaliation claim.

- *Pre-1998 comment by coworker to Brown's manager that "[Y]ou need to tell that nigger not to be putting all that grease on the molds."* This was remote in time (over five years prior to this suit), the statement was not made directly to Brown, and Brown requested no remedial action regarding this comment.

- *"Nigger scabs" on bathroom wall.* In late 2002 or early 2003, Brown found this phrase written on a bathroom wall at Goodyear. He told area manager Sue Smith, who immediately had the words painted over by a maintenance worker. The fact that there were only 2 incidents of racial epithets over a six-year period (pre-1998 to the filing of this suit) indicates that they were isolated and did not create an objectively hostile environment. Sallis, 408 F.3d at 476-77 (two racial epithets–"nigger" and "damn Somalians"– combined with a few other examples of harassment, such as calling the plaintiff dark or tanned, held insufficient to establish racially hostile environment).[4]

- *2002 or 2003 ridicule for mopping the floor.* On one instance, a coworker mocked Brown while Brown was mopping the floor after fluid leaked from his forklift. Brown reported this to his area manager and she immediately chastised the coworker. The incident had no racial component and was not repeated.

---

[4]There is no merit to Brown's related assertion that his work environment was hostile in part because only African-Americans were referred to as scabs. The evidence establishes that during the 1997 Goodyear strike, the only two employees who crossed the picket line were African-American (Brown and Stanley Dowd). Furthermore, Brown and Dowd already brought and lost a Title VII racial discrimination suit based on their treatment during the strike.

-15-

- *"[T]hey're going to fire you."*  This random comment, made in passing by an African-American coworker, had no racial component.  Brown testified that he had no idea what it meant, and that he reported it to no one.

- *Flier of Brown sleeping on the job.*  <u>After</u> Brown was discharged, he was told by a coworker that a flier showing photographs of Brown sleeping on the job had been posted on a Goodyear bulletin board.  This flier had been discovered by the area manager for the part of the plant where the flier was posted, Wally Hughes.  Shortly after learning of the flier, Hughes removed the flier and met with the employees he supervised to warn them that such postings were improper and that cameras were not allowed in the plant.  This remedial action was taken before Brown even learned about the flier.  The fact that an African-American employee who sleeps on the job was mocked for his somnolence is not indicative of a racially hostile environment when there is no evidence that employees from other ethnic groups also slept on the job but were not mocked.

Brown has failed to prove a prima facie case.  The five incidents cited by Brown are legally insufficient to create a racially hostile environment. Only two involved race.  The incidents were isolated and infrequent, did not threaten physical harm, and did not interfere with Brown's work performance.  Most were followed by prompt remedial action.

## C. Title VII Retaliation

Brown asserts that his termination was unlawful retaliation for engaging in two separate protected activities:  filing previous discrimination charges against Goodyear and requesting FMLA leave.  (Filing 39, Pl.'s Br. at 6.)  As Title VII protects employees from retaliation for engaging in activities protected by Title VII, I do not understand Brown to be asserting that Title VII protects him from retaliation for requesting FMLA leave.[5]  I here consider only the Title VII retaliation claim.  Any FMLA violation is addressed only in the section of this opinion dealing with FMLA.

In order to establish a prima facie case of Title VII retaliation, a plaintiff must prove that: (1) he engaged in statutorily protected activity; (2) an adverse employment action took place; and (3) there was a causal connection between the two events." See, e.g., Rheineck v. Hutchinson Tech., Inc., 261 F.3d 751, 757 (8th Cir. 2001) (citations omitted).  The defendant may rebut this prima facie case by showing a legitimate, nondiscriminatory reason for the adverse action.  Then, "[i]f the defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal discrimination."  Id.

It is undisputed that Brown's filing of two discrimination suits constituted protected activities under Title VII and that Brown was terminated.  However, Brown cannot establish the necessary causal connection between his 2003 termination and the discrimination lawsuits he filed against Goodyear in 1998 and 2000.

Although he acknowledges that years had passed between his filing of discrimination lawsuits and his termination, Brown asserts that a "'pattern of adverse

---

[5]Similarly, NFEPA protects employees from retaliation for opposing practices made unlawful by NFEPA or making charges under NFEPA and does not address retaliation for filing a FMLA claim.  Neb. Rev. Stat. Ann. § 48-1114.

actions' . . . creates temporal proximity," and that "all the intervening discriminatory conduct that Defendant's management failed to stop and rectify" is a chain of events constituting the pattern of adverse actions necessary to create temporal proximity." (Filing 39, Pl.'s Br. at 7.)  In support, Brown cites paragraph 8 of his affidavit as an example of continuous acts of discrimination.  (Filing 39, Pl.'s Br. at 7.)  The cited portion of his affidavit states in full:  "I have been subjected to a hostile work environment since before my first lawsuit against Goodyear in 1997, and this continued until my termination in 2003.  My coworkers treated me poorly, because of my race, and management never successfully put an end [to] this."  (Filing 41, Brown Aff. ¶ 8.)  This unsupported allegation in Brown's affidavit does not establish that there was any discriminatory conduct between the last-filed discrimination lawsuit in 2000 (which resulted in summary judgment for Goodyear on Brown's Title VII retaliation claim) and Brown's 2003 termination.  I have already explained that the five incidents Brown relies upon to establish hostile environment (one of which was prior to 2000) fail to establish a prima facie case of hostile environment.  For the same reasons those incidents are insufficient to establish hostile environment, they are insufficient to create a temporal link between Brown's 2000 lawsuit and his 2003 termination.

The extended time gap between Brown's 2000 lawsuit and his 2003 termination is insufficient to establish the causal connection necessary for a Title VII retaliation claim.  See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)(adverse action taken 20 months after protected activity suggests no causality); and Hesse v. Avis Rent A Car System, Inc., 394 F.3d 624, 633 (8th Cir. 2005) (finding no causal connection when termination was "almost two years" after protected activity and observing that a gap in time between the protected activity and the adverse employment action weakens any inference of retaliatory motive).

Even if Brown could establish a prima facie case of retaliatory discharge (and he cannot), his claim would still fail.  Goodyear has established that Brown was

-18-

terminated for violation of the Attendance Policy. Brown acknowledges that this was the stated reason for his termination, although he asserts that he did not violate the policy because he submitted a wrongly denied FMLA leave request. In the next section, I explain why Browns's FMLA leave request was appropriately denied. Brown has made no showing that his termination for violation of the Attendance Policy was a pretext for racial discrimination.

### D.  FMLA Claim

The complaint asserts that Brown was terminated in violation of 29 U.S.C. § 2615(a)(2). That section of the FMLA provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Claims arising under section 2615(a)(2) are referred to as retaliation or discrimination theory claims. Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 977 (8th Cir. 2005) (distinguishing between claims arising under § 2615(a)(1), alternatively referred to as interference or entitlement theory claims, and claims arising under § 2615(a)(2), alternatively referred to as retaliation or discrimination theory claims). As the complaint did not plead an interference claim, and Brown's brief addresses only FMLA retaliation, I do not consider Brown to have made an FMLA interference claim.

An employee establishes a prima facie case of FMLA retaliation by showing (1) the employee engaged in activity protected under the FMLA, (2) the employee suffered an adverse employment action, and (3) a "causal connection existed between the employee's action and the adverse employment action." Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002). See also Hatchett v. Philander Smith Coll., 251 F.3d 670, 677 (8th Cir. 2001) ("In order to establish the prima facie case for FMLA retaliation, the employee must demonstrate that FMLA leave was the determinative factor in the employment decision at issue."). If a prima facie case is established, the employer may proffer a nondiscriminatory reason for the adverse action. The plaintiff

must then come forward with evidence indicating that the proffered nondiscriminatory reason was mere pretext for FMLA discrimination.  See, e.g., Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002).

For purposes of this motion for summary judgment, I assume that submitting a FMLA leave request is a protected act–even if that FMLA leave request establishes on its face that the plaintiff is not entitled to FMLA protection.[6]  It is undisputed that termination is an adverse action.  However, Brown cannot establish a prima facie case because he cannot establish the necessary causal connection.   Goodyear had suspended Brown for violation of the Attendance Policy before Brown submitted an FMLA leave request for the absence that was counted as an "occurrence" under the Attendance Policy.  The post-suspension meetings were an opportunity for Brown to challenge whether his absence was a valid "occurrence" under the Attendance Policy. Unless Brown submitted a valid argument that his April 4 absence should not have been counted as an occurrence, the suspension would become termination under the Attendance Policy.[7]   Furthermore, even if Brown has established a prima facie retaliation case (and he has not), Goodyear has established that Brown's FMLA leave request was validly denied because he did not have a serious health condition.

_____

[6]I do not decide this question.  There are sister district courts in the Eighth Circuit on both sides of it.  Compare Gonzalez v. City of Minneapolis, 267 F. Supp. 2d 1004, 1012 (D. Minn. 2003) (plaintiff easily established first element of prima facie case because he filed for FMLA leave) with Schmittou v. Wal-Mart Stores, Inc., No. Civ. 011763, 2003 WL 22075763, at *7 (D. Minn. Aug. 22, 2003) (declaring it impossible for an employee who was not eligible for leave under the FMLA to engage in any activity protected by the statute).

[7]See paragraph 9 of the statement of facts for an example of an instance where a post-absence meeting led to Goodyear accepting Brown's argument that a January 30, 2003 absence should not have been treated as an occurrence.

Brown submitted a FMLA leave request, on a Certificate of Health Care Provider form approved by the U.S. Department of Labor, Form WH-380.  An employee is entitled to FMLA leave for his health only if the employee establishes that he or she has a "serious health condition." 29 U.S.C. § 2612(a)(1)(D) (an eligible employee is entitled to FMLA leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.").

There are six categories of "serious health condition" reflected on the fourth page of Form WH-380:   (1) Hospital Care; (2) Absence Plus Treatment; (3) Pregnancy; (4) Chronic Conditions Requiring Treatments; (5) Permanent/Long-term Conditions Requiring Supervision, and (6) Multiple Treatments (Non-Chronic Conditions).  (Keith Decl. Ex. 1.)  These are also defined in 29 C.F.R. § 825.114(a).

The top of the first page of the form requires the health care provider to check the category of the employee's "serious health condition."  It lists numbers 1-6 and refers to the descriptions on page four of the form.  The physician assistant who saw Brown on April 7 completed this form at Brown's request.  He checked category two (Absence Plus Treatment).  He also indicated that Brown would be absent from work for only one day–although a three-day absence is needed to establish a serious medical condition due to "Absence Plus Treatment."  (Keith Decl. Ex. 1; 29 C.F.R. § 825.114(a)(2)(1) (providing that a serious health condition involving continuing treatment of the employee by a health care provider must include a period of incapacity of more than three consecutive calendar days).)  Brown was in fact absent from work for only the first 45 minutes of his eight-hour shift, from 11:00 p.m to 11:45 p.m on April 4, before he arrived at work and completed the last seven hours and forty-five minutes of his shift.

Goodyear sent Brown a registered letter stating the reasons why his FMLA leave for April 4 was denied, and this letter clearly indicates that the submitted

request failed to establish that Brown had a serious medical condition based on "Absence Plus Treatment." Yet Brown now argues that (1) there were mistakes in the submitted form and the health care provider should have checked category four, for Chronic Conditions Requiring Treatment, because Brown has hypertension and (2) Goodyear was obligated to make further inquiry to determine whether Brown was entitled to FMLA leave for a reason other than that certified by his health care provider and submitted to Goodyear. Brown asserts that Goodyear was obligated to make this inquiry because it has an obligation to "check[] into the validity of the requested leave," citing Spangler v. Federal Home Loan Bank of Des Moines, 278 F.3d 847, 853 (8th Cir. 2002). (Filing 39, Pl.'s Br. at 12.)

Spangler addresses the question of when facts place an employer on inquiry notice that an employee may be requesting FMLA leave, and what an employer who has such inquiry notice must do. Inquiry notice cases are totally inapposite to the situation before me–where the employer knows that an employee is requesting FMLA leave because the employee has submitted an FMLA certification stating that he is entitled to FMLA medical leave for a stated reason. To the extent Goodyear had an obligation to check into the validity of the leave requested in Brown's WH-380 form, it met that obligation by assessing whether the health care provider had made the necessary certification to establish that Brown had an FMLA "serious medical condition" based on "absence plus treatment"–the type of medical condition Brown claimed to have–and by notifying Brown of its decision.

A WH-380 form showing that an employee is not entitled to FMLA leave because his medical condition does not require his absence from work creates a "negative certification" such that when the employee later seeks FMLA leave for the same medical condition, the employer is entitled to rely on the certifications in the earlier WH-380 form and does not need "additional information" within the meaning of 29 C.F.R. § 825.303(b). Stoops v. One Call Comm., Inc., 141 F.3d 309, 313 (7th Cir. 1998) (regulation at issue requires employer who has sufficient notice that

employee seeks FMLA leave to investigate further if it needs "additional information" to determine whether leave is FMLA-qualifying; employee had provided no medical opinions other than those in the WH-380 form). Brown knew that Goodyear considered WH-380 form to be a negative certification–Goodyear sent him a registered letter telling him why his FMLA leave request was denied. It is undisputed that Brown never submitted another FMLA leave request form or any additional information regarding his April 4 tardiness to Goodyear. Goodyear was not required to investigate further in the absence of a contradictory medical opinion supplied by Brown.

Goodyear has also established that in the year preceding Brown's discharge, the manager who approved all FMLA requests from the belt center (Mike Keith) approved 89 of 110 FMLA leave requests from employees in the belt center. Of the 21 denied requests, three were resubmitted with corrected information and all three were then approved. This same Goodyear manager approved October 2000, December 2000, and October 2001 FMLA leave requests submitted by Brown. Brown was clearly familiar with the FMLA leave request procedure. The letter from Goodyear explaining why FMLA leave was denied was clear and succinct.

Brown's April 2003 FMLA leave request was validly denied. He was terminated because he had excessive absences while on probation for violations of the Attendance Policy. In light of Goodyear's a history of approving valid FMLA leave requests (including three by Brown), Brown has failed to establish that his termination for violation of the Attendance Policy was a pretext for discrimination for filing the April 2003 leave request. See Hatchett, 251 F.3d at 677 (suggesting but not directly stating that requesting FMLA leave was not the determinative factor in employment decision when employee could not demonstrate she was entitled to FMLA leave).

-23-

## III.  CONCLUSION

The evidence, viewed in the light most favorable to Brown, shows that there is no genuine issue of material fact and Goodyear is entitled to a judgment as a matter of law.

Accordingly,

IT IS ORDERED:

1.      The defendant's motion for summary judgment (filing 24) is granted, and the plaintiff's action is dismissed with prejudice; and

2.      Judgment shall be entered by separate order.

April 24, 2006.                                  BY THE COURT:

                                                 *s/Richard G. Kopf*
                                                 United States District Judge